[Cite as *Lowder v. Domingo*, 2017-Ohio-1241.]

COURT OF APPEALS
STARK COUNTY, OHIO
FIFTH APPELLATE DISTRICT

| | |
|---|---|
| JANET L. LOWDER,<br>GUARDIAN OF KRISTIA MAYERS,<br>A MINOR | JUDGES:<br>Hon. W. Scott Gwin, P.J.<br>Hon. William B. Hoffman, J.<br>Hon. John W. Wise, J. |
|      Plaintiff-Appellant | Case No. 2016CA00043 |
| -vs- | |
| ALBERT T. DOMINGO, M.D., ET AL. | O P I N I O N |
|      Defendant-Appellees | |

| | |
|---|---|
| CHARACTER OF PROCEEDING: | Appeal from the Stark County Court of Common Pleas, Case No. 2014CV01866 |
| JUDGMENT: | Affirmed |
| DATE OF JUDGMENT ENTRY: | March 31, 2017 |
| APPEARANCES: | |

For Plaintiff-Appellant

PAMELA PANTAGES
DAVID W. SKALL
The Becker Law Firm, L.P.A.
134 Middle Avenue
Elyria, Ohio 44035

PAUL W. FLOWERS
Paul W. Flowers Co., L.P.A.
Terminal Tower, Suite 1910
50 Public Square
Cleveland, Ohio 44113

For Defendant-Appellees

DAVID M. BEST
David M. Best Co., L.P.A.
4900 W. Bath Road
Akron, Ohio 44333

STEPHEN P. GRIFFIN
MICHAEL J. KAHLENBERG
Winkhart Rambacher & Griffin
825 S. Main Street
N. Canton, Ohio 44720

*Hoffman, J.*

{¶1}   Plaintiff-appellant Janet L. Lowder, Guardian of Kristia Mayers, a minor, appeals the February 2, 2016 Judgment Entry entered by the Stark County Court of Common Pleas, granting judgment in favor of defendant-appellee Dr. Albert T. Domingo, M.D., following a jury trial.

## STATEMENT OF THE CASE AND FACTS

{¶2}   On August 8, 2014, Appellant filed a Complaint, alleging Kristia Mayers sustained permanent brachial plexus injury due to Appellee's mismanagement of shoulder dystocia during Kristia's delivery on June 9, 2009. Shoulder dystocia is a complication during childbirth where a baby's shoulder becomes caught in the birth canal after the head has delivered.  Appellant further alleged Appellee applied excessive force during delivery, employed unaccepted medical maneuvers when the baby's shoulder became lodged against her mother's pelvic bone, and failed to offer Kristia's mother the option to deliver by cesarean section due to her diabetes.

{¶3}   The matter proceeded to trial on January 19, 2016.

{¶4}   Marti Mayers, the biological mother of Kristia, testified she was diagnosed with diabetes in 2007.  She became pregnant with Kristia the following year.  Appellee was Ms. Mayers' obstetrician.   Ms. Mayer recalled, following an ultrasound and biophysical profile testing, Appellee advised her the baby was large and she would probably need to deliver by cesarean section.  Ms. Mayers testified Appellee told her the diabetes caused the baby to develop broad shoulders and to have a larger bone structure, and indicated shoulder dystocia was a potential concern during delivery.

{¶5} Appellee testified Ms. Mayers had an ultrasound in May, 2009. The ultrasound revealed her baby's birth weight would likely be less than 4,500 grams; therefore, Ms. Mayers would not need to deliver by cesarean section. Ms. Mayers had a routine office visit on June 5, 2009. At that time, the baby's gestational age was 36 weeks and 5 days. Appellee planned to check the baby again at 38 weeks. However, on June 9, 2009, Ms. Mayers presented at Appellee's office, and although she was not in active labor, her cervix was dilated approximately one centimeter. Appellee made arrangements to have Ms. Mayers transported to Mercy Medical Center for progression into active labor.

{¶6} During the delivery, Appellee identified shoulder dystocia involving Kristia's right shoulder. Appellee employed several recognized and accepted maneuvers to alleviate the shoulder dystocia, including a right medial lateral episiotomy, McRobert's maneuver, extension of the episiotomy, the application of suprapubic pressure, and delivery of the posterior arm. Appellee was able to free the baby's shoulder and complete the delivery. Following delivery, Dr. Adyemi Sobowale, the attending pediatrician, noted bruising on Kristia's skin and a lack of movement and sensation in her left arm. Dr. Sobowale charted left Erb's palsy/nerve traction.

{¶7} Appellant's expert witness, Dr. Frank Bottiglieri, a Board certified obstetrician/gynecologist who has practiced obstetrics and gynecology for thirty seven years, opined Appellee used "an untested, unproven maneuver" to address the shoulder dystocia and, as a result, caused the left brachial plexus damage. Dr. Bottiglieri also testified Appellee's failure to offer Ms. Mayers a cesarean section delivery fell below the accepted standard of care.

**{¶8}** Attorney Pam Pantages, counsel for Appellant, asked Dr. Bottiglieri if he had ever, during the 6,000 deliveries he performed, caused a brachial plexus injury. Dr. Bottiglieri replied, "No." Trial Transcript, Vol. II at 235. Thereafter, Attorney Pantages asked whether the doctor had ever performed a delivery during which a brachial plexus injury occurred before shoulder dystocia was identified and addressed, Dr. Bottiglieri replied:

No, that's never happened to me, and there's no literature anywhere that would support that. Forces of labor cannot cause this injury * * * It's physically, anatomically impossible to have five levels of nerves either ripped from the spinal cord or torn apart from forces of labor. And happening before, that's based on a theory based on a model that's flawed that it happened miraculously. The single greatest correlate, over 90 percent of all the studies show, antecedent shoulder dystocia and its management is how you get permanent injury. *Id.* at 238-239.

**{¶9}** Throughout his direct examination, Dr. Bottiglieri emphasized "the only way you're going to tear" the brachial plexus nerves is through the application of excessive lateral traction. *Id.* at 310-311, 313-314, 381.

**{¶10}** During his cross-examination, Dr. Bottiglieri again indicated he had never delivered a baby with a permanent brachial plexus injury. Thereafter, Attorney David

Best, counsel for Appellee, showed Dr. Bottiglieri a complaint and lawsuit[1] in which the doctor was named a defendant and was alleged to have used excessive force during delivery which resulted in a permanent brachial plexus injury. Attorney Best asked Dr. Bottiglieri 17 questions regarding this lawsuit before Attorney Pantages asked to approach the bench. The trial court discussed the issue with the parties, stated the objection was overruled, and permitted Attorney Best to continue the line of questioning. Dr. Bottiglieri acknowledged Dr. Mark Landon, one of Appellee's experts in the instant action, served as an expert witness in support of his defense. The lawsuit, which occurred 23 years earlier, resulted in a verdict in favor of Dr. Bottiglieri.

{¶11} Dr. Robert Gherman, a Board certified obstetrician/gynecologist and maternal fetal medicine physician, testified on Appellee's behalf. Dr. Gherman serves as the chairman of the brachial plexus palsy committee of the American College of Obstetrics and Gynecology, and assisted in the drafting, peer review, and publication of ACOG's 2014 publication, *Neonatal Brachial Plexus Palsy*. Dr. Gherman opined the standard of care did not warrant offering Ms. Mayers the option of a cesarean section delivery, and it was reasonable for Appellee to proceed with a vaginal delivery. Dr. Gherman noted Appellee appropriately handled the shoulder dystocia.

{¶12} Dr. Mark Landon, a Board certified obstetrician/gynecologist who specializes in maternal fetal medicine at The Ohio State University, also testified on Appellee's behalf. Dr. Landon agreed because the baby's fetal weight was estimated to

---

[1] In Appellee's Brief to this Court, Appellee states, "Upon further inquiry and without Dr. Domingo's Counsel offering any exhibit as evidence, Dr. Bottiglieri then admitted a lawsuit had been filed against him where the plaintiff alleged he caused a permanent brachial plexus injury." Brief of Appellee at 10.

be less than 4,500 grams, the standard of care did not warrant Appellee offering Ms. Mayers a cesarean section delivery. Dr. Landon opined the brachial plexus injury was not caused by any action or failure to act by Appellee.

{¶13} Dr. Landon testified Appellee's attempts to resolve the shoulder dystocia did not cause the brachial plexus injuries. Dr. Landon stated his belief the injury occurred during the birthing process before the shoulder dystocia actually was apparent or recognized. Dr. Landon indicated if Appellee had used excessive lateral force, the baby's right arm, not her left arm as had occurred, would have sustained injury. Dr. Landon also noted Appellee did not violate the standard of care by failing to deliver the baby by cesarean section simply because Ms. Mayers was diabetic.

{¶14} Upon conclusion of the evidence and after counsel for the parties gave closing arguments, the trial court instructed the jury on the applicable law. The trial court, over objection from Appellant, included the "different methods" charge. The jury returned a verdict in favor of Appellee on February 2, 2016. The trial court memorialized the verdict in a judgment entry filed the same day.

{¶15} It is from that judgment entry Appellant appeals, raising the following assignments of error:


I. THE TRIAL JUDGE ABUSED HER DISCRETION WHEN DEFENDANT-APPELLEES [SIC] WERE ALLOWED TO IMPROPERLY IMPEACH PLAINTIFF-APPELLANT'S STANDARD OF CARE EXPERT WITH AN EXTRINSIC PRIOR LAWSUIT.

II. THE TRIAL COURT ERRED, AS A MATTER OF LAW, BY FURNISHING INCORRECT AND UNWARRANTED JURY INSTRUCTIONS.

I

**{¶16}** In her first assignment of error, Appellant contends the trial court erred in allowing Appellee to impeach her standard of care expert with extrinsic evidence of a prior lawsuit.  Specifically, during cross-examination, Attorney Best questioned Dr. Bottiglieri regarding a prior lawsuit in which he was named a defendant and was alleged to have caused a permanent brachial plexus injury.

**{¶17}** On cross-examination, Attorney Best and Dr. Bottiglieri engaged in the following exchange:

Q. Now, you've talked a lot about this knowledge that you have about brachial plexus injuries, but you've never personally had a permanent brachial plexus injury yourself, correct?

A. That is correct. That is correct.

Q. So you don't have any personal experience where you delivered a baby with a permanent brachial plexus injury that you can tell this jury about?

A. Thank God, no.  I used the appropriate maneuvers and I've avoided it.  I don't need to cause an injury to talk about it.

Q. Doctor, let me have just one moment here and I'll grab something and we're getting near the end. I'm showing you a complaint and lawsuit that says that the defendants had a patient that had a history of obesity, weight gain, rupture of membranes, gestational diabetes –

A. Correct.

Q. – there was a delivery, and the delivery was done vaginally?

A. That's correct.

Q. And that the result of the negligence of that, she suffered a shoulder dystocia?

A. Correct.

Q. And then it goes on to state that the defendants caused permanent brachial plexus injuries and other permanent and disfiguring injuries.

A. Correct.

Q. Do you see that?

A. I sure do. Very familiar with it.

Q. Who's the defendant in that case?

A. My corporation.

Q. Is Frank Bottiglieri the named defendant?

A. It is. He is.

Q. Okay. And so you were sued for using excessive force causing a brachial plexus injury that was permanent, correct?

A. That was the allegation, yes. And it also turned out to be a fraudulent case which you're well aware of.  We can discuss that.

Q. And you denied that –

A. Correct.

Q. – and stated you had another explanation for how that injury occurred that was not you pulling too hard, correct?

A. That is correct. And I'd love to give you the – you have the details and I –

Q. And you hired an expert to defend you in that case; didn't you?

A. I did not hire anyone.  PIE hired them, the insurance company. I didn't hire anyone.

Q. Did your lawyer have an expert come to trial?

A. I'm sure they did.

Q. You went to trial; didn't you?

A. Yes, there was an 11 minute verdict. And the case was – excuse me, and the case was referred to the state's attorney for fraud * * *

THE COURT: I'm going to stop you again, Dr. Bottiglieri. Answer the question, please.

THE WITNESS: I've answered the question. It was a fraudulent case and it was turned over to the state's attorney.

THE COURT: All right.  Sufficient enough. Please –

BY MR. BEST:

Q. Did it go to trial?

A. It went to trial.

Q. Did you defend yourself claiming that, yes, there was a permanent brachial plexus injury, but it was not due to my pulling too hard?

A. No, you're not getting it.

Q. Did you hire –

A. The videotape showed no permanent injury. There was no injury. It was a fraudulent case.

Q. Did you or your lawyer hire an expert to defend you in that case who testified at trial?

A. I'm sure he or she did.

Q. Do you know who that expert was that was identified as a – providing a certificate of met – meritorious defense –

MS. PANTAGES: Can we approach?

BY MR. BEST:

Q. – you had a valid defense, it was Dr. Mark Landon who is testifying in this case –

THE COURT: Hold on a second. Please approach.

Tr., Vol. II at 406-410.

**{¶18}** The following discussion was conducted outside the presence of the jury:

MS. PANTAGES: It was my understanding when this case started that you had cautioned me against talking about any prior lawsuits.

THE COURT: Regarding Dr. Domingo.

MR. BEST: That wasn't your ruling as to experts. You said we can do it for experts.

THE COURT: For experts. It was to Dr. Domingo himself because that's what the case law said. So you can do it as to experts, but not – I specifically outlined it as that it did not apply to Dr. Domingo.

* * *

MR. SKALL (Co-Counsel for Appellant): Is our objection noted?

THE COURT: Your objection is noted.

*Id.* at 410.

{¶19} Thereafter, Attorney Best questioned Dr. Bottiglieri about Dr. Landon testifying as the expert in his defense and why Dr. Bottiglieri claimed to not know Dr. Landon when asked during his deposition in the instant action.  The questioning concluded with Dr. Bottiglieri reiterating the case against him was fraudulent as the baby had not suffered a permanent injury.

{¶20} The record reveals Attorney Best asked 17 questions to Dr. Bottiglieri regarding the lawsuit before Attorney Pantages asked to approach the bench.

{¶21}  A party waives and may not raise on appeal any error which arises during the trial court proceedings if that party fails to bring the error to the court's attention, by objection or otherwise, at a time when the trial court could avoid or correct the error. *Goldfuss v. Davidson,* 79 Ohio St.3d 116, 121–123, 679 N.E.2d 1099 (1997). A failure to object at trial waives all but plain error. *Id.* The plain error doctrine is applicable in civil

cases only where the error "seriously affects the basic fairness, integrity, or public reputation of the judicial process." *Id.* at syllabus.

**{¶22}** We find Attorney Pantages' request to approach the bench was not an appropriate objection as to Attorney Best's first 17 questions about the prior lawsuit. We find Appellant's failure to timely object constitutes a waiver of any alleged error in the consideration of such evidence admitted prior to counsel approaching the bench. We further find no plain error in the trial court allowing Attorney Best to cross examine Dr. Bottiglieri regarding the prior lawsuit against him.

**{¶23}** Assuming, arguendo, Appellant did not waive the alleged error, we, nonetheless, find the trial court did not err in allowing the testimony.

**{¶24}** Appellant submits Appellee violated the trial court's ruling on Defendant's Motion in Limine No. 9. Appellant explains the ruling prohibited the parties from questioning expert witnesses about present and prior medical malpractice cases. We disagree.

**{¶25}** In his Motion in Limine No. 9, Appellee moved the trial court for an order precluding "Plaintiffs, Plaintiffs' attorneys, and Plaintiffs['] witnesses, at any stage of trial, including *voir dire*, opening, and closing statements, examinations of witnesses, or argument to the Court in front of the jury, from questioning, arguing, discussing, or mentioning outcomes (verdicts or settlements) of other medical malpractice cases in which any of the attorneys or experts (Plaintiffs' and/or Defendants') in this case have been involved in as attorneys or expert." Via Judgment Entry filed January 16, 2016, the trial court sustained the motion "as to any evidence regarding other pending, or resolved medical malpractice cases involving the parties, including the Defendant, and attorneys."

The trial court noted, "In accordance with *Oberlin v. Akron General Medical Center*, 91 Ohio St.3d 16, 2001-Ohio-248, *counsel may inquire of expert witnesses (other than the Defendant) as to any pending medical malpractice cases alleging a medical error similar to that alleged in this case* to prove, bias, prejudice, or motive to misrepresent." *Id.* (Emphasis added.)

{¶26} Given the trial court's ruling on Appellee's Motion in Limine No. 9, we find the trial court's overruling of Appellant's objection was consistent therewith. We note at no time did Appellant raise an objection based upon Evid.R. 608(B) and/or 616(C) which she now raises for the first time in her brief.

{¶27} We also find Appellant opened the door to this line of questioning.

{¶28} During Dr. Bottiglieri's direct examination, Attorney Pantages posed the following question to him:

> [The jury] heard Kristia has a left global brachial plexus injury with all five nerve roots torn and her left brachial plexus injury being completely destroyed in the delivery, three of the nerve roots ripped out of her spinal cord. That that was apparent in the immediate newborn period when she had no movement and no feeling in her left upper extremity. In 6,000 deliveries, has that ever happened to you? Tr., Vol. II at 235.

{¶29} Dr. Bottiglieri replied, "No." Subsequently, Attorney Pantages asked Dr. Bottiglieri whether he had ever performed a delivery during which a brachial plexus injury occurred before shoulder dystocia was recognized and addressed. Dr. Bottiglieri replied:

No, that's never happened to me, and there's no literature anywhere that would support that. Forces of labor cannot cause this injury * * * It's physically, anatomically impossible to have five levels of nerves either ripped from the spinal cord or torn apart from forces of labor. And happening before, that's based on a theory based on a model that's flawed that it happened miraculously. The single greatest correlate, over 90 percent of all the studies show, antecedent shoulder dystocia and its management is how you get permanent injury. *Id.* at 238-239.

**{¶30}** Because Attorney Pantages asked Dr. Bottiglieri if he had ever caused a brachial plexus injury during his career, we find Appellant opened the door to inquiry into past lawsuits against Dr. Bottiglieri involving allegations of such injury.

**{¶31}** Appellant further argues Appellee could not use extrinsic evidence to impeach Dr. Bottiglieri on a collateral matter. At no time did Appellant raise an objection based upon Evid.R. 608(B) and or Evid.R. 616(C) in the trial court. She raises them for the first time in her brief to this Court. Appellant has not preserved for review any error in admission based thereon. Nonetheless, we elect to analyze Appellant's argument.

**{¶32}** Evid.R. 608(B) provides, in relevant part:

*Specific instances of the conduct of a witness*, *for the purpose of attacking or supporting the witness's character for truthfulness*, other than conviction of crime as provided in Evid.R. 609, *may not be proved by*

*extrinsic evidence.* They may, however, in the discretion of the court, if clearly probative of truthfulness or untruthfulness, be inquired into on cross-examination of the witness (1) concerning the witness's character for truthfulness or untruthfulness, or (2) concerning the character for truthfulness or untruthfulness of another witness as to which character the witness being cross-examined has testified. Evid. R. 608(B). (Emphasis added.)

**{¶33}** Evid. R. 616(C), which sets forth the methods of impeachment on cross examination, provides:

**(C) Specific Contradiction.** Facts contradicting a witness's testimony may be shown for the purpose of impeaching the witness's testimony. If offered for the sole purpose of impeaching a witness's testimony, extrinsic evidence of contradiction is inadmissible unless the evidence is one of the following:

(1) Permitted by Evid. R. 608(A), 609, 613, 616(A), 616(B), or 706;

(2) Permitted by the common law of impeachment and not in conflict with the Rules of Evidence. Evid. R. 616(C).

**{¶34}** As stated, supra, Appellant asserts the testimony regarding Dr. Bottiglieri's prior lawsuit was a collateral issue; therefore, the trial court should have prohibited Appellee from cross examining Dr. Bottiglieri about the case. A "matter is non-collateral

and extrinsic evidence consequently (is) admissible if the matter itself is relevant to a fact of consequence on the historical merits of the case." *Bedard v. Gardner,* 2d Dist. No. 20430, 2005-Ohio-4196, ¶ 64, citing 1 McCormick, supra, Section 49, at 203.

**{¶35}** Appellant presented expert testimony to establish a permanent brachial plexus injury can only occur if the delivering physician employees excess lateral force. Appellee defended himself by introducing expert evidence a brachial plexus injury can occur in the absence of excessive lateral traction. Appellant placed the issue of whether a permanent brachial plexus injury can result in the absence of excessive lateral force before the jury. We find such was not a collateral issue, but rather germane to the case. Accordingly, we find no error in the trial court's admission of the evidence.

**{¶36}** We find even if the alleged error in the admission of the prior lawsuit against Dr. Bottiglieri had been preserved for review as being admitted in violation of Evid.R. 608(B) and/or 616(C), the trial court did not abuse its discretion in allowing Appellee to cross examine Dr. Bottiglieri with extrinsic evidence of the prior lawsuit against him.

**{¶37}** Appellant's first assignment of error is overruled.

II

**{¶38}** In her second assignment of error, Appellant submits the trial court erred by providing the "different methods" charge to the jury as said instruction was incorrect and unwarranted. We disagree.

**{¶39}** The determination whether to give a jury instruction is a matter left to the sound discretion of the trial court. *Telle v. Pasley,* 5th Dist. Delaware No. 12CAE080048, 2013–Ohio–2407, at ¶ 42 (Citation omitted). A trial court is obligated to provide jury instructions which correctly and completely state the law. *Cromer v. Children's Hosp.*

*Med. Ctr. of Akron,* 142 Ohio St.3d 257, 2015-Ohio-229, 29 N.E.3d 921, ¶ 22 (Citation omitted.) The jury instructions must also be warranted by the evidence presented in a case. *Estate of Hall v. Akron Gen. Med. Ctr.,* 125 Ohio St.3d 300, 2010-Ohio-1041, 927 N.E.2d 1112, ¶ 26. The question of whether a jury instruction is legally correct and factually warranted is subject to de novo review. *Id.* An inadequate instruction which misleads the jury constitutes reversible error. *Marshall v. Gibson*, 19 Ohio St.3d 10, 12, 482 N.E.2d 583 (1985).

**{¶40}** Our standard of review when it is claimed improper jury instructions were given is to consider the jury charge as a whole and determine whether the charge misled the jury in a manner affecting the complaining party's substantial rights. *Dublin v. Pewamo Ltd.,* 194 Ohio App.3d 57, 2011-Ohio-1758, 954 N.E.2d 1225, ¶ 28 (Citation omitted.)

**{¶41}** The trial court instructed the jury as follows:

Although some other physician might have used a method of treatment and procedure different from that used by the Defendant, this circumstance will not by itself prove that the Defendant was negligent. You shall decide whether the treatment and procedure used by the Defendant was in accordance with the required standard of care. The customary or routine method of treatment and procedure may be considered by you along with all the other facts and circumstances in evidence.

Although a particular method may be customary, usual or routine, this circumstance will not by itself prove that method to be within the standard of care. You shall decide whether the method of treatment and

procedure used by the Defendant was in accordance with the required standard of care. Tr., Vol. X at 25.

**{¶42}** "In medical malpractice cases, the 'different methods' charge to the jury is appropriate only if there is evidence that more than one method of diagnosis or treatment is acceptable for a particular medical condition." *Pesek v. Univ. Neurologists Assn., Inc.*, 87 Ohio St.3d 495, 721 N.E.2d 1011 (2000), syllabus. The purpose of such an instruction is to inform the jury that, because alternative methods can be used, the selection of one method over another is not, per se, negligence. *Id.* at 498. "The instruction is grounded 'on the principle that juries, with their limited medical knowledge, should not be forced to decide which of two acceptable treatments should have been performed by a defendant physician'." *Id.*, quoting Dailey, *The Two Schools of Thought and Informed Consent Doctrines in Pennsylvania: A Model for Integration,* 98 Dickinson L.Rev. 713 (1994).

**{¶43}** Counsel for Appellant objected to the trial court's decision to give the "different methods" charge to the jury, arguing:

> We object to the different methods instruction. The Plaintiff's case, at least part of the Plaintiff's case is that Dr. Domingo managed the shoulder dystocia below the standard of care. He used delivery maneuvers that no one in this case so far has used. So it's not – the issue isn't did he pick from among different methods, the issue is he used a method that is not within the standard of care.

So we would argue that this is not a different – this is not a case where a different methods instruction would be appropriate. Tr., Vol. IX at 86-87.

{¶44} Appellant submits the experts agreed there were "only certain time-tested responses to a shoulder dystocia", to wit: McRobert's positioning; suprapubic pressure, Rubin's maneuver; Wood's maneuver; and delivery of the posterior arm. Reply Brief of Appellant at 10. Appellant explains, "the staunch position of the defense experts was that Dr. Domingo had properly performed the maneuvers, <u>not</u> that he had followed an alternative 'different' approach that was also recognized as appropriate under the standard of care." *Id.* We disagree with Appellant's interpretation of the "different methods" instruction.

{¶45} During the course of the trial, the jury heard evidence of the different obstetrical maneuvers a physician may employ to manage shoulder dystocia, all of which fell within the standard of care. Appellee, himself, testified he employed these accepted maneuvers, including a right medical lateral episiotomy, McRobert's maneuver, extension of the episiotomy, the application of suprapubic pressure and delivery of the posterior arm. We find this is the exact situation which warrants the inclusion of the "different methods" instruction in the jury charge. The purpose of the instruction is to avoid confusing the jury in situations in which the evidence establishes the physician's selection of one acceptable method instead of another does not, in and of itself, constitute a breach of the standard of care. *Pesek*, supra at 498.

{¶46} Because evidence was presented which indicated Appellee could have utilized different methods and still have acted within the standard of care, we find the trial court's instruction was appropriate.

{¶47} Appellant's second assignment of error is overruled.

{¶48} The judgment of the Stark County Court of Common Pleas is affirmed.

By: Hoffman, J.

Gwin, P.J. and

Wise, John, J. concur