[Cite as *In re Guardianship of Pond*, 2022-Ohio-4023.]

COURT OF APPEALS
DELAWARE COUNTY, OHIO
FIFTH APPELLATE DISTRICT

|  |  | JUDGES: |
| --- | --- | --- |
| IN THE MATTER OF: | : | Hon. Earle E. Wise, P.J. |
| THE GUARDIANSHIP OF | : | Hon. W. Scott Gwin, J. |
| MARY ANN POND | : | Hon. Patricia A. Delaney, J. |
|  | : |  |
|  | : |  |
|  | : |  |
|  | : | Case No. 22 CAF 06 0045 |
|  | : |  |
|  | : |  |
|  | : |  |
|  | : | OPINION |

CHARACTER OF PROCEEDING:     Civil appeal from the Delaware Court of
                             Common Pleas, Probate Division, Case No.
                             21020198PGU

JUDGMENT:                    Affirmed

DATE OF JUDGMENT ENTRY:      November 10, 2022

APPEARANCES:

For Appellee                          For Appellant

ADRIANN MCGEE                         DAVID POND, PRO SE
200 Civic Center Drive, Ste. 800      5952 Nike Drive
Columbus, OH 43215                    Hilliard, OH 43026

*Gwin, J.,*

**{¶1}** Appellant appeals the May 16, 2022, judgment entry of the Delaware County Court of Common Pleas, Probate Division, overruling his objections to the magistrate's decision.

*Facts & Procedural History*

**{¶2}** On February 18, 2021, Elizabeth Carey ("Carey"), a caseworker with Delaware County Department of Job and Family Services ("DCDJFS"), filed an application for appointment of guardian of alleged incompetent Mary Ann Pond ("Mary"). Attached to the application is a document entitled "supplemental information for guardianship." The document includes the following information: in October of 2020, DCDJFS received a report about financial exploitation of Mary; when the caseworker made contact with Mary in November of 2020, she observed Mary to be thin, disheveled, hard to understand, and not making sense; Mary was not oriented to the month, day, year, or her age; DCDJFS received another report about Mary regarding her increased confusion; on January 26, 2021, medics reported Mary was very confused; Mary's son, appellant David Pond, reported she left a burner on the stove on and a wooden cover over the burner caught fire; appellant accompanied Mary to the Gerlach Center on February 5, 2021 for an evaluation of competency; appellant met with the doctor and insisted the doctor back-date the expert report to July of 2020; when the doctor refused, appellant got upset and left with Mary; and appellant refused to have Mary immediately evaluated for competency to ensure her immediate safety.

**{¶3}** Due to a miscommunication, DCDJFS contacted multiple potential guardians. Accordingly, attorneys Adriann McGee, S. Brewster Randall, and Christopher

Gasper each filed guardianship applications.  Appellant also filed his own application for guardianship of Mary.

**{¶4}**  The trial court set the guardianship applications for hearing on March 9, 2021.  On February 26, 2021, an "affidavit of service" was filed.  The affidavit states that a deputy clerk of court "served upon David Pond a Notice of Hearing for Appointment of Guardian of Alleged Incompetent" by "personal service" at the Probate Court in Delaware Ohio on February 26, 2021.  The notices of hearing to Mary's other living next of kin, sons Robert Pond and Scott Pond, were sent via certified mail.  Mary was served personally by the probate court's investigator.

**{¶5}**  DCDJFS requested the trial court, pursuant to R.C. 2111.031, appoint a physician or other qualified person to examine Mary and provide an expert evaluation to decide whether a guardianship is necessary.  The trial court granted the motion, and appointed Princess Black, a licensed psychologist, to complete an expert evaluation of Mary.  Black submitted her statement of expert evaluation and report on March 3, 2021. She diagnosed Mary with dementia and stated Mary could not answer any medical questions, as Mary was disoriented and started talking about random things.  Black stated Mary was very difficult to follow, and much of what she said did not make sense.  Black concluded, due to "Mary's state of dementia, disorientation and confusion, lack of medical treatment, and being unable to manage her finances, a guardianship is recommended at this time.  Given her recent decline in cognitive functioning it is also recommended she be medically assessed as soon as possible."

**{¶6}**  After Black's report was filed, Nikolas McCoy ("McCoy") filed an application for emergency guardianship on March 3, 2021, citing Mary's recent, substantial cognitive

decline and possible malnutrition. After an ex parte hearing, the magistrate granted the application for emergency guardianship for a period of seventy-two hours. After a hearing on March 5, 2021, the trial court extended the emergency guardianship until April 5, 2021.

{¶7} The trial court conducted a hearing on the five applications for appointment of guardianship on March 9, 2021. Prior to the hearing, S. Brewster Randall withdrew his application for guardianship due to a potential conflict of interest because he previously served as Mary's personal estate planning lawyer.

{¶8} At the beginning of the hearing, the magistrate inquired of each party and their counsel, "does your client wish to challenge that finding of incompetency by the court?" Each party/counsel responded, "no," including appellant's counsel. The magistrate stated, "everyone is in agreement that Mary Ann Pond is an incompetent person pursuant to Chapter 2111 of the Ohio Revised Code. So that issue is at rest and does not need to be re-litigated." During appellant's cross-examination, counsel for DCDJFS inquired, "at the beginning of the hearing today, you did, through your attorney, agree to the Court's finding of incompetence, correct?" Appellant responded, "yes."

{¶9} Appellant presented a 2018 durable power of attorney he held for Mary's finances and health care. However, these powers of attorney were subsequently revoked by Mary. Appellant also presented a durable power of attorney for financial management Mary signed on February 11, 2021. Appellant downloaded the form for the power of attorney from a legal website. Appellant believed Mary understood what she was doing when she signed the document because, "she would have good days and she would have bad days. And if – if you give her a cup of coffee, she would have a great day." Appellant

took Mary to a bank so the employees could notarize the power of attorney.  He testified they spent about five minutes having a meeting at the bank.

{¶10}  When asked if Mary is capable of making her own medical decisions, appellant stated she can on her good days, but cannot on her bad days.  Appellant believes Mary can do activities of daily living, and "if you give her a cup of coffee, she does great."  However, appellant confirmed Mary has had dementia "probably since about 2019."  Appellant believes Mary has Alzheimer's dementia, and would sundown in the evening and get very confused, but if you caught her in the morning and give her coffee, she was not a danger to herself.  When asked how he attempted to make Mary's home safe so she could stay at home, appellant stated he tried, but Mary would not let him install a hand-rail or remove carpet.  Appellant did turn the circuit breaker off after a kitchen fire.  Appellant did not previously exercise his power of attorney because he felt Mary was making decisions on her good days.  Appellant stated he and other family and friends were checking on Mary.

{¶11}  Appellant stated that, if he was appointed guardian, he would make sure Mary's house was safe and hire care for her.  Even if he is not appointed guardian, appellant wishes to assist in Mary's care.

{¶12}  Appellant confirmed he assisted in investing Mary's funds in physical gold and silver.  Appellant testified it was a joint decision between Mary and himself, and both of them knew his father (Mary's husband) previously did very well investing in gold.  The gold was kept at Mary's house, except for a shipment of approximately $20,000 that was lost in transit.

{¶13} Randall was Mary's estate planning attorney for approximately the last five-and-a-half years. He assisted Mary in preparing the revocations of the 2018 powers of attorney. Mary was concerned about appellant due to his divorce and had concerns about his ability to manage finances since he was no longer working. Appellant stated Randall "tricked" Mary into signing the revocations. Randall denied "tricking" Mary into revoking the documents, and stated Mary called him and the revocations were her idea.

{¶14} Carey is an investigator with DCDJFS Adult Protective Services. The agency originally received a report about Mary on October 23, 2020, alleging Mary's son Scott stole $900,000 from her home. There were also concerns reported about Mary's cognition and her keeping large amounts of money in her home. Carey obtained the police report on the theft incident, and discovered it was actually $98,000 allegedly stolen from Mary's home. Carey attempted to visit Mary's home. She spoke with Mary's son Steve, who had concerns about Mary's declining memory. Carey spoke with appellant, who expressed concerns about Mary, such as her inability to use a phone or write a check. Appellant had extreme concerns about people taking advantage of Mary. Carey had concerns during her interactions with Mary, because Mary would jump from topic to topic, could not follow a conversation, and was not oriented to the date, month, year, or her age. Carey obtained multiple calls Mary made to the police in the prior year, including calls where Mary stated she didn't know how to use the stove, and a call while she was at the vet with her pet and she was confused. Carey spoke with Dr. Tornik, Mary's personal physician. Tornik was long-time friends of the Pond family and appellant. Tornik had concerns for Mary's capacity and the potential for financial exploitation.

{¶15} Mary wanted Carey to leave when she visited in December and January, but then began talking to Carey. Mary did not allow Carey into the home, so she spoke to Carey through the window or outside. Carey described Mary as appearing disheveled with cognition issues. Appellant was initially cooperative with Carey, but then took Mary and left prior to the competency evaluation because the physician would not back-date the competency evaluation to July of 2020 when Mary changed her trust and power of attorney. Carey again saw Mary on February 25, 2021 on her porch. Carey described Mary as "a lot worse than [she] had seen any other time." Mary was unable to articulate a sentence, and thought her deceased husband was alive.

{¶16} Carey does not believe appellant would be a good legal representative to represent Mary's best interest because appellant was not protecting Mary or making sure all her basic needs were being met prior to DCDJFS' involvement. Carey believes a guardianship is appropriate under the circumstances in order to ensure Mary's health and safety.

{¶17} McCoy is an attorney who was appointed emergency guardian of Mary. When McCoy first met Mary at her home after obtaining emergency guardianship, she answered the door clutching a stuffed animal and she was filthy. Mary let McCoy into the house and was "very confused," using "word salad," or a jumble of words that has no cohesion. McCoy called an ambulance to transport her to the hospital. McCoy returned to the residence the next day, and found nothing in the refrigerator except condiments. When he went to take Mary's purse to her at the hospital, he discovered she had $7,162.76 in cash in her purse. From his observations and discussions with multiple individuals, including family members and the doctors taking care of Mary, McCoy

concluded that Mary has needed twenty-four-hour care for some time. McCoy knows Mary wants to remain in her home, so it is his goal to return her to her home with the twenty-four-hour supervision she needs, including a working alarm and security system, which she did not have.

{¶18} McCoy believes Mary needs a guardian. He does not believe a healthcare power of attorney and financial power of attorney are adequate to provide the authority and protection Mary needs. Based on everything he has seen so far, up until the time he got involved, the individuals taking care of Mary were not doing the job adequately.

{¶19} From McCoy's investigation of Mary's financial records, Mary wrote a check to appellant for $96,000 in May of 2020. Mary wrote approximately $3.1 million in checks to Hartford Gold Group in January and February of 2021. McCoy described appellant as being unreasonable and uncooperative with him, even though McCoy does not have a "dog in the fight" and simply is trying to be an effective guardian for Mary.

{¶20} The magistrate issued a decision on March 22, 2021. First, the magistrate stated, "all of the applicants through counsel agreed that the issue of incompetence at this hearing was not in dispute, and they agreed that Mrs. Pond is incompetent to make decisions." The magistrate found, by clear and convincing evidence, that: less restrictive alternatives to guardianship are not working and are operationally inappropriate; Mary is mentally impaired and is not capable of taking care of herself or her property due to dementia; the condition manifests itself through impairment of Mary's orientation, speech, motor behavior, thought process, memory, concentration and comprehension disorientation, and confusion; notice of the hearing was properly made; it is in the best interest of Mary to have a guardian for her person and estate; and Adrian McGee is

suitable to assume the duties of guardian of the estate.  The magistrate requested McCoy, as emergency guardian of Mary's person, apply for guardianship of the person.

{¶21}  As to appellant's argument that there were lesser restrictive alternatives to guardianship since there are powers of attorney, the magistrate found the mere existence of these documents is not enough to preclude a guardianship, and the court must take into consideration whether the planning documents for a lesser restrictive alternative are actually working.  The magistrate concluded the powers of attorney were not working to protect the interests of Mary, and Exhibit 3, dated February 11, 2021 was signed at a time when Mary was incompetent.  The magistrate found appellant assisted and encouraged Mary to send two checks from trust accounts for approximately three million dollars to a firm in California to buy gold and silver to be physically delivered to Mary's house.

{¶22}  McCoy filed an application for guardian of the person of Mary.  The magistrate then terminated the emergency guardianship of Mary, revoked the emergency guardianship, and appointed McCoy as guardian of the person on March 26, 2021.

{¶23}  Appellant filed objections to the magistrate's decision on April 5, 2021.  He included the following objections:  the financial power of attorney executed by Mary Pond on February 11, 2021 is valid, and it should be given a reasonable opportunity to demonstrate that it is a viable less restrictive alternative to a guardianship of the estate; and a guardian of the person is not the least restrictive alternative for Mary Pond.  Appellant requested a hearing on his objections to the magistrate's decision "in order to provide evidence on relevant events that have occurred since the hearing before the magistrate."

{¶24} The trial court held ruling on the objections while the parties participated in mediation. However, after mediation was unsuccessful, the trial court issued a detailed judgment entry on May 16, 2022, overruling appellant's objections to the magistrate's decision. The trial court found appellant is not suitable to be guardian or attorney-in-fact for Mary, stating: appellant's opinion of Mary's competency seems to shift based on which opinion would give him the most say in her financial affairs; appellant has not demonstrated sufficient financial sophistication to oversee a multi-million dollar estate, as evidenced by his conversion of Mary's $3.1 million liquid cash bank accounts into physical gold and silver coins which were kept in an insecure manner; appellant is involved in allegations of possible financial abuse of Mary, either as the accuser or the accused, so he is not a disinterested party; during the time when appellant was allegedly Mary's health care and financial agent, she was physically dirty, had almost no food in her refrigerator, and was completely incapable of carrying on even a brief conversation; during that time, appellant did little to improve Mary's condition apart from dropping off a meal at least once a day; the fact that appellant could not identify how to remedy Mary's situation in the condition that she was in is sufficient to disqualify him from the guardian of her person; and appellant demonstrated his unwillingness to comply with the recommendations of others when he removed Mary from the Gerlach center before she could evaluated and when he instructed Mary not to cooperate with the court's investigator.

{¶25} Next, the trial court found the power of attorney purportedly executed by Mary on February 11, 2021 is insufficient to serve as a less restrictive alternative to guardianship, and found appellant's unsuitability renders the power of attorney an unfeasible less restrictive alternative. As to appellant's argument that he should be given

a reasonable opportunity to demonstrate the power of attorney constitutes a less restrictive alternative, the court noted appellant was unaware that his prior powers of attorney were revoked until only recently, and when appellant believed he had the power to take the same sort of actions he could take under the February 11, 2021 power of attorney for many months, he did nothing to improve Mary's care.  The trial court also cited the language of the February 11th power of attorney that "this document does not authorize anyone to make medical or other health care decisions," and stated that since Mary is incompetent and has no valid health care power of attorney, without the guardianship, no one would be authorized to make medical decisions for her.  The trial court concluded the February 11, 2021 power of attorney is an unfeasible less restrictive alternative because it fails to create a mechanism for making Mary's medical decisions.

{¶26}  As to appellant's argument that Mary sometimes has good days and bad days, and good hours and bad hours, the court found, "the fact that Ms. Pond may sometimes have the capacity to make her own financial decisions is simply not sufficient to protect her property and economic security all the time * * * an agent acting pursuant to a power of attorney cannot maintain the constant vigilance that would be necessary to ensure that no one takes advantage of Ms. Pond given her advanced dementia, therefore the severe restrictions of a full guardianship are necessary."  The trial court determined a full guardianship was necessary to protect Mary and is in her best interest.

{¶27}  The trial court overruled appellant's objection to McCoy as the guardian, finding the Rules of Superintendence were met in the appointment of him as guardian, and noted the basis for appellant's objection is largely based on events that occurred subsequent to the hearing.

{¶28} Appellant appeals the May 16, 2022, judgment entry of the Delaware County Court of Common Pleas, Probate Division, and assigns the following as error:

{¶29} "I.   THE PROBATE COURT ERRED AND ABUSED ITS DISCRETION WHEN IT HELD THREE EMERGENCY HEARINGS ON [THE] COMPETENCY OF MARY ANN POND WITHOUT NOTIFYING HER OR HER FAMILY.   ESPECIALLY WHEN DR. DAVID POND REQUESTED TO BE PRESENT TO THE APS WORKER WELL IN ADVANCE OF ANY HEARING.

{¶30} "II.   THE PROBATE COURT ERRED AND ABUSED ITS DISCRETION WHEN IT IGNORED MARY ANN POND'S FOURTH CONSTITUTIONAL AMENDMENT RIGHT AND SENT A COURT INVESTIGATOR TO HER HOUSE IN THE MIDDLE OF THE EVENING WITHOUT NOTICE, AND WITHOUT GIVING HER THE CHANCE TO HAVE FAMILY OR HER ATTORNEY PRESENT, ESPECIALLY WHEN THERE WAS NO RISK OF DANGER TO MARY ANN POND BY OTHERS, AND SHE WAS NOT A DANGER TO HERSELF.   MARY ANN POND WAS NOT IN ANY EMERGENCY SITUATION AT THE TIME OF THE INVESTIGATION.  THERE WAS NO EMERGENCY.

{¶31} "III.   THE PROBATE COURT ERRED AND ABUSED ITS DISCRETION WHEN IT TOOK VERBAL EVIDENCE FROM NICHOLAS MCCOY AS A COURT INVESTIGATOR THAT WAS OBTAINED AGAINST THE FOURTH AMENDMENT OF THE CONSTITUTION AND AGAINST THE WILL OF MARY ANN POND WHEN HE CAME TO HER HOUSE IN THE MIDDLE OF THE EVENING AND BARGED INTO HER HOUSE WITHOUT HER PERMISSION TO PERFORM AN INVESTIGATION.  IN FACT, MARY ANN POND HAD TOLD THE APS WORKER ON SEVERAL OCCASIONS SHE DID NOT WANT HER AROUND AND TOLD ANY AND ALL PROBATE COURT

INDIVIDUALS THE SAME. MARY ANN POND DID EVERYTHING IN HER POWER TO AVOID ANY PROBATE INVOLVEMENT IN HER LIFE, AS EVIDENCED BY HER AND HER HUSBAND'S TRUSTS. THE EVIDENCE OBTAINED ILLEGALLY BY ATTORNEY MCCOY NOT ONLY WAS FACTUALLY ERRONEOUS, IT SHOULD HAVE BEEN EXCLUDED FROM EVIDENCE AS IT WAS AN ILLEGAL SEARCH AND SEIZURE OF PERSON AND PROPERTY. MR. MCCOY DID NOT SHOW EVIDENCE OF ANY OF HIS ALLEGATIONS TO PROVE THAT THE INFORMATION HE PROVIDED WAS TRUE AND WITHOUT ERROR. THERE WAS NO TRUE EMERGENCY, SHE WAS NOT A DANGER TO HERSELF, AND SHE WAS NOT IN DANGER FROM OTHERS. SHE WAS NOT MALNOURISHED AS EVIDENCED BY MEDICAL REPORTS FROM HER PRIMARY CARE PHYSICIAN OFFICE ONE WEEK PRIOR TO HER BEING TAKEN.

{¶32} "IV. THE PROBATE COURT ERRED AND ABUSED ITS DISCRETION WHEN IT IGNORED MEDICAL TESTIMONY FROM DR. DAVID POND, A LICENSED PHYSICIAN IN THE STATE OF OHIO WITH OVER 20 YEARS EXPERIENCE, OVER THAT OF ATTORNEY NICHOLAS MCCOY AND BETH CAREY WHO BOTH HAVE NO KNOWN MEDICAL CREDENTIALS, LICENSURE, SKILLS, OR TRAINING ON BEING ABLE TO DETERMINE MEDICAL CONDITIONS IN INDIVIDUALS.

{¶33} "V. THE PROBATE COURT ERRED AND ABUSED ITS DISCRETION WHEN IT WENT AGAINST THE TESTIMONY OF DR. DAVID POND WHEN HE STATED HIS MOTHER WAS NOT INCOMPETENT AND HE COULD HAVE COMMUNICATIONS WITH HER AND COMPLETELY UNDERSTAND WHAT SHE WANTED AND NEEDED.

{¶34} "VI.  THE TRIAL COURT ERRED AND ABUSED ITS DISCRETION WHEN IT WENT AGAINST THE TESTIMONY OF DR. DAVID POND WHEN HE STATED HE HAD NOT TAKEN OVER HIS MOTHER'S FINANCES, NOR INVOKED HIS CONTROL OVER HER PERSON OR HER TRUSTS.   DR. DAVID POND WAS STILL COMMUNICATING WITH HIS MOTHER AND HELPING HER WITH MEALS, BUT MARY ANN POND WAS STILL PERFORMING HER ACTIVITIES OF DAILY LIVING, SHE WAS NOT WANDERING, AND SHE WAS STILL [IN CHARGE OF] HER CARE. SHE WAS STILL VERY MUCH IN CONTROL OF HER FINANCES.  TO THE EXTENT THAT SHE NEEDED HELP, SHE HAD HIRED MICHELLE SHERMAN TO FURTHER HELP WITH HER FINANCES.  AT THE TIME OF THE INVESTIGATION, MARY ANN POND WAS IN SOUND MIND TO MAKE DECISIONS FOR HERSELF, ACCORDING TO MYSELF AND AN EXPERT WITNESS IN HEALTHCARE.

{¶35} "VII.  THE PROBATE COURT ERRED AND ABUSED ITS DISCRETION WHEN IT IGNORED OHIO LAW AND DID NOT ALLOW FOR THE LESSER RESTRICTIVE ALTERNATIVE TO GUARDIANSHIP.

{¶36} "VIII.  THE PROBATE COURT ERRED AND ABUSED ITS DISCRETION WHEN IT IGNORED THAT THE TRUSTS OF MARY ANN POND AND ROBERT J. POND HAD [BEEN] SET UP TO AVOID PROBATE COURT, AND WERE IN AND OF THEMSELVES A LESSER RESTRICTIVE ALTERNATIVE TO GUARDIANSHIP.

{¶37} "IX.  THE PROBATE COURT ERRED AND ABUSED ITS DISCRETION WHEN IT IGNORED A MEDICAL POWER OF ATTORNEY AND A GENERAL POWER OF ATTORNEY SIGNED BY MARY ANN POND SEVERAL MONTHS PRIOR TO BEING DECLARED INCOMPETENT, ESPECIALLY WHEN DR. DAVID POND HELD THE

CONFIDENCE OF HIS MOTHER MARY ANN POND SINCE EARLY 2000 WHEN HE WAS HER MEDICAL POWER OF ATTORNEY SINCE HE BECAME A PHYSICIAN.

{¶38} "X. THE PROBATE COURT ERRED AND ABUSED ITS DISCRETION WHEN IT REFUSED TO HOLD A HEARING ON THE OBJECTION TO THE MAGISTRATE'S DECISION, EFFECTIVELY BARRING US FROM OFFERING UP THE PREVIOUS OBJECTIONS, AND PRESENTING EVIDENCE.

{¶39} "XI. THE PROBATE COURT ERRED AND ABUSED ITS DISCRETION WHEN IT ALLOWED A GUARDIAN TO REPRESENT THEIR OWN SELF-INTERESTS AND ARGUE IN COURT AGAINST MOTIONS AND EVEN THIS APPEAL WHEN THE WARD, MARY ANN POND, HAD BEEN APPOINTED A COURT-APPOINTED ATTORNEY.

{¶40} "XII. THE PROBATE COURT ERRED AND ABUSED ITS DISCRETION WHEN IT REMOVED DR. DAVID POND FROM GUARDIANSHIP OF MARY ANN POND BASED ON FINANCIAL ADVICE GIVEN TO MARY ANN POND ABOUT BUYING PHYSICAL GOLD AND SILVER DURING TIMES OF ECONOMIC TURMOIL AND HYPERINFLATION.

{¶41} "XIII. THE PROBATE COURT ERRED AND ABUSED ITS DISCRETION BY MAKING DECISIONS BASED ON HEARSAY THAT TURNED OUT TO BE FALSE WHEN ACCEPTING EVIDENCE AND ARGUMENTS WOULD HAVE PROVEN THE TRUTH OF THE MATTER."

*Failure to Object & Plain Error*

{¶42} We initially note that appellant failed to object to many of the issues he raises on appeal at either the hearing before the magistrate or in his objections to the

magistrate's decision. On those issues, appellant has therefore waived all but plain error. The plain error doctrine is applicable in civil cases only where the error "seriously affects the basic fairness, integrity, or public reputation of the judicial process." *Lowder v. Domingo*, 5th Dist. Stark No. 2016CA00043, 2017-Ohio-1241.

I.

**{¶43}** In his first assignment of error, appellant argues the probate court erred and abused its discretion when it held three emergency hearings on competency of Mary without notifying her or her family.

**{¶44}** Appellant did not raise this argument at the hearing or in his objections to the magistrate's decision. Accordingly, a plain error review applies. It is unclear whether appellant is referencing the emergency guardianship hearing, or the full guardianship hearing starting on March 9, 2021.

**{¶45}** As to the emergency guardianship hearing, appellant did not appeal the appointment of the emergency guardian. Additionally, pursuant to R.C. 2111.02 and R.C. 2111.04, an emergency guardianship hearing is an ex parte hearing, and no notice is required until after the emergency guardian is appointed.

**{¶46}** With regard to the March 9th hearing, proper notice of the hearing was provided. The deputy clerk served appellant with notice of the hearing by personal service on February 26, 2021. The notices of hearing to Mary's other living next of kin, sons Robert Pond and Scott Pond, were sent via certified mail. Mary was served personally by the probate court investigator. Additionally, appellant and his brothers all actually attended the March 9th hearing, and each had the opportunity to present evidence and be heard.

{¶47} Appellant's first assignment of error is overruled.

II.

{¶48} In his second assignment of error, appellant contends the trial court erred and abused its discretion by admitting "illegal evidence" that Carey obtained in violation of Mary's Fourth Amendment constitutional right against unreasonable search and seizure when Carey went to Mary's house without consent and without her family present.

{¶49} Appellant did not raise this argument in his objections to the magistrate's decision. Accordingly, a plain error review applies. We find no plain error in this case. Carey testified that when she visited Mary's home, she did not go into the house. Rather, Carey spoke to Mary through a window or outside and, after initially stating she did not want to talk to her, Mary voluntarily spoke to Carey through the window or outside the home. Appellant's second assignment of error is overruled.

III.

{¶50} In his third assignment of error, appellant argues the trial court abused its discretion when it admitted McCoy's testimony because the information McCoy related in his testimony was obtained in violation of Mary's Fourth Amendment constitutional right against unreasonable search and seizure because McCoy entered Mary's home without her permission.

{¶51} Appellant did not raise this argument in his objections to the magistrate's decision. Accordingly, a plain error review applies. We find no plain error in this case. McCoy went to Mary's house after being appointed her emergency guardian, and entered the home with consent because Mary let him into the home. Any "search" McCoy made was for financial documents, a key to lock the home, and to collect Mary's personal effects

to deliver to her at the hospital. These actions were all taken pursuant to his duties and powers as Mary's guardian. Further, McCoy is a private party, not a state actor subject to Fourth Amendment scrutiny. The "Fourth Amendment's proscription on searches and seizures are inapplicable to private action." *United States v. Jacobsen*, 466 U.S. 109, 104 S.Ct. 1652, 80 L.Ed.2d 85 (1984); *Village of Granville v. Eastman*, 5th Dist. Licking No. 2006CA00050, 2006-Ohio-6237.

{¶52} Appellant's third assignment of error is overruled.

## IV., V., VI.

{¶53} In his fourth, fifth, and sixth assignments of error, appellant contends the trial court abused its discretion when it "ignored" his testimony that Mary was not incompetent, as appellant testified that Mary was performing her activities of daily living, was in control of her finances, and was in sound mind to make decisions herself.

{¶54} During the emergency guardianship hearing, the magistrate found Mary incompetent. This finding was adopted and approved by the trial court. Appellant did not appeal the emergency guardianship entry or incompetency finding. At the beginning of the full guardianship hearing, the magistrate inquired of each party and their counsel whether they or their client wanted to challenge the finding of incompetency by the trial court. Each party or counsel responded, "no," including counsel for appellant. The magistrate stated, "everyone is in agreement that Mary Ann Pond is an incompetent person pursuant to Chapter 2111 of the Ohio Revised Code * * * so that issue does not need to be re-litigated." Further, counsel for DCDJFS inquired of appellant, "at the beginning of the hearing today, you did, through your attorney, agree to the Court's finding of incompetence, correct?" Appellant responded, "yes."

**{¶55}** Thus, Mary's competency was not at issue during the hearing. A stipulation is a voluntary agreement, admission, or concession made by the parties or their attorneys concerning disposition of some relevant point in order to eliminate the need for proof or to narrow the range of issues to be litigated. *State v. Small*, 162 Ohio App.3d 375, 2005-Ohio-3813, 833 N.E.2d 774 (10th Dist. Franklin); *Baum v. Baum*, 9th Dist. Wayne No. 97CA0022, 1997 WL 775770 (Nov. 26, 1997). When parties "choose to stipulate facts in lieu of presenting evidence, they [waive] any error that may have occurred with respect to the fact that the trial court decided * * *." *State v. Miller*, 3rd Dist. Seneca No. 13-20-14, 2021-Ohio-4472; *Crow v. Nationwide Mut. Ins. Co.*, 159 Ohio App.3d 417, 2004-Ohio-7117, 824 N.E.2d 127 (5th Dist.).

**{¶56}** Further, as to appellant's contention that the trial court "ignored" his testimony, it is clear the trial court did take his testimony into consideration, but did not find it credible given the testimony of the other witnesses, and because appellant's testimony was inconsistent. We defer to the trial court on the issue of credibility because the trial court is "best able to view the witnesses and observe their demeanor, gestures, and voice inflections, and use these observations in weighing the credibility of the proferred testimony." *Seasons Coal Co. v. Cleveland*, 10 Ohio St.3d 77, 461 N.E.2d 1273 (1984).

**{¶57}** Appellants, fourth, fifth, and sixth assignments of error are overruled.

VII., VIII., IX.

**{¶58}** In his seventh, eighth, and ninth assignments of error, appellant argues the trial court abused its discretion when it found the trust documents and power of attorney

were not appropriate less restrictive alternatives available in lieu of an independent guardian.

**{¶59}** A probate court's decision to appoint a guardian is generally within the sound discretion of the trial court and will not be reversed absent an abuse of discretion. *In re Guardianship of Borland*, 5th Dist. Stark No. 2002CA00410, 2003-Ohio-6870. An abuse of discretion indicates the trial court was unreasonable, arbitrary, or unconscionable in its ruling. *Blakemore v. Blakemore*, 5 Ohio St.3d 217, 450 N.E.2d 1140 (1983). "A reviewing court will not reverse a judgment appointing a guardian as an abuse of discretion if it is supported by competent and credible evidence." *In re Guardianship of Waller*, 1st Dist. Hamilton No. C-100131, 2011-Ohio-313

**{¶60}** R.C. 2111.02(C) provides that evidence of a less restrictive alternative to guardianship may be introduced, and, if introduced, shall be considered by the court. A probate court may deny a guardianship if it finds a less restrictive alternative to guardianship exists. R.C. 2111.02(C)(6). However, while the statute requires the trial court to consider the existence of a less restrictive alternative to guardianship, it does not require a probate court to deny an application for guardianship simply because evidence of less restrictive alternatives is produced. *In re Guardianship of Collins*, 12th Dist. Warren No. CA2013-08—0072, 2014-Ohio-5750. In matters relating to guardianship, the probate court is required to act in the best interest of the ward. *Id.*

**{¶61}** We find the trial court did not abuse its discretion in finding that a guardianship was necessary and that a less restrictive alternative in the form of the power of attorney or trust would not sufficiently protect Mary. Although appellant argues the power of attorney was sufficient to provide for the care and safety of Mary because she

was capable of making decisions, during the hearing, appellant stipulated that Mary was incompetent.

{¶62} The trial court found the power of attorney executed in February of 2021 was not a viable alternative to appointment of a guardian. The trial court noted that, when appellant thought he held a valid durable and health care power of attorney, he did nothing to improve Mary's care. The trial court also found it concerning that the February 2021 power of attorney specifically and intentionally does not authorize anyone to make medical or health care decisions; since Mary is incompetent and has no other valid health care power of attorney, no one would be authorized to make medical decisions absent a guardianship. Though appellant argues the health care power of attorney Mary executed in 2018 protects her, there was undisputed and unrebutted evidence that Mary revoked the health care power of attorney. The trial court further found that even if Mary had "good hours," as testified to by appellant, that is not sufficient to protect her property because a power of attorney cannot maintain the constant vigilance needed to ensure no one takes advance of Mary due to her advanced dementia. The trial court concluded it was in Mary's best interest to establish a guardianship.

{¶63} Upon review, we conclude the trial court could have reasonably determined that the terms of the preexisting trust and power of attorney were insufficient to provide the type of protection of Mary's assets that the appointment of a guardian would provide. Similarly, the trial court could have reasonably determined that the power of attorney was insufficient to provide the type of safety and security needed, and insufficient to provide for Mary's medical decisions. McCoy and Carey both testified that Mary needs a guardian.

**{¶64}** Appellant's seventh, eighth, and ninth assignments of error are overruled.

X.

**{¶65}** In his tenth assignment of error, appellant contends the trial court abused its discretion in not holding a hearing on appellant's objections to the magistrate's decision.

**{¶66}** Pursuant to Civil Rule 53(D)(4)(d), "* * *In ruling on objections, the court shall undertake an independent review as to the objected matters to ascertain that the magistrate has properly determined the factual issues and appropriately applied the law. Before so ruling, the court may hear additional evidence but may refuse to do so unless the objecting party demonstrates that the party could not, with reasonable diligence, have produced that evidence for consideration by the magistrate." Civil Rule 53(D)(4)(d) does not require the trial court to hold a hearing prior to ruling on a party's objections to a magistrate's decision.

**{¶67}** In his request for hearing, appellant stated he wished to present "additional evidence" to the trial court. Rule 53(D)(4)(d) does not require courts to take additional evidence. Rather, the rule permits courts to take or preclude additional evidence if they wish to do so. *Donofrio v. Whitman*, 191 Ohio App.3d 727, 2010-Ohio-6406, 947 N.E.2d 715 (7th Dist.). The trial court has discretion to decide whether to hear additional evidence after the parties submit objections to the magistrate's report. *In re J.W.*, 5th Dist. Richland No. 2021 CA 0007, 2021-Ohio-2917. Accordingly, when a trial court hears or does not hear additional evidence, we review this decision under an abuse of discretion standard. *Parrish v. Parrish*, 5th Dist. Knox No. 15CA4, 2015-Ohio-4560.

{¶68} Upon our review of the record, we find the trial court did not abuse its discretion in denying appellant's motion to hear additional evidence. In his request for hearing, appellant did not state what additional evidence he sought to present, or demonstrate how he could not, with reasonable diligence, have presented the evidence to the magistrate. Appellant's tenth assignment of error is overruled.

XI.

{¶69} In his eleventh assignment of error, appellant argues the probate court erred and abused its discretion when it permitted the guardian to argue in court "against motions and even this appeal."

{¶70} Appellant did not raise this argument in his objections to the magistrate's decision. Accordingly, a plain error review applies.

{¶71} We find no plain error in this case. Appellant provides no legal support, and this Court can find no legal authority, for his contention that an applicant for guardianship and/or his or her counsel cannot argue or respond to certain motions or appeals.

{¶72} Appellant's eleventh assignment of error is overruled.

XII.

{¶73} In his twelfth assignment of error, appellant contends the trial court abused its discretion when it "removed him from guardianship" based on financial advice given to Mary about buying physical gold and silver.

{¶74} We first note that appellant was not "removed" from being Mary's guardian, as he was never appointed Mary's guardian. Further, the trial court did not deny appellant's application for guardianship based upon the financial advice about buying physical gold and silver. The trial court specifically stated, "to be clear, the Court does

not question investment in gold as an asset class, but the investment in physical gold to be kept in an insecure manner demonstrates poor financial judgment." The trial court was concerned that appellant told Carey that Mary could not even write a check, but then testified at the guardianship hearing that Mary was capable of handling her own finances. The trial court additionally found appellant's opinion about Mary's capabilities inconsistent, and found appellant's opinions were closely linked to what gave appellant the greatest control over Mary's finances. Because of these issues, the trial court determined appellant was ineligible to serve as Mary's financial agent. Additionally, the trial court found appointing appellant as guardian of Mary's estate would create an impermissible conflict pursuant to Superintendence Rule 66 because he was previously involved in reporting a theft and was accused by others of financially taking advantage of Mary.

**{¶75}** Appellant also contends McCoy is an unsuitable guardian, and appellant himself should have been appointed guardian. When considering an application for appointment of a guardian, a probate court must determine whether a guardian is required and also determine who shall be appointed guardian. *In re Guardianship of Collins*, 12th Dist. Warren No. CA2013-08-0072, 2014-Ohio-5750. A probate court has broad discretion in appointing guardians, and decisions regarding the appointment of a guardian will not be reversed on appeal absent an abuse of discretion. *Id.* The probate court is required to act in the best interest of the ward. *Id.*

**{¶76}** We find there is competent and credible evidence to support the trial court's decision to appoint McCoy rather than appellant. When appellant was purportedly acting under a health care and financial power of attorney for Mary, Mary was physically dirty,

had almost no food in her refrigerator, and was incapable of carrying on a brief conversation. During this time, appellant did little to improve her condition. Additionally, appellant testified inconsistently about Mary's competency when discussing her ability to maintain her finances, and appellant was both the accuser and the accused in the alleged mishandling of Mary's financial affairs.

{¶77} The trial court believed the testimony of Carey and McCoy, and the statement of expert evaluation of Black, rather than the testimony of appellant. As an appellate court, we do not function as fact-finders; we neither weigh the evidence nor judge the credibility of the witnesses. *Seasons Coal Co. v. Cleveland,* 10 Ohio St.3d 77, 461 N.E.2d 1273 (1984). Our role is to determine whether there is relevant, competent, and credible evidence upon which the fact-finder could base his or her judgment. *Id.* The trial court is "best able to view the witness and observe their demeanor, gestures, and voice inflictions, and use these observations in weighing the credibility of the proffered testimony." *Id.*

{¶78} Appellant's twelfth assignment of error is overruled.

XIII.

{¶79} In his final assignment of error, appellant contends the trial court abused its discretion by making decisions based on hearsay that "turned out to be false."

{¶80} Appellant did not object to any testimony at the hearing on the basis of hearsay. Further, appellant did not raise this argument in his objections to the magistrate's decision. Accordingly, a plain error review applies.

{¶81} We find no plain error in this case. Appellant fails to specifically identify what statements he alleges were improper hearsay, or how the trial court relied on the statements in its judgment entry.

{¶82} Appellant mentions what he believes are "glaring errors" of Carey and McCoy about the amount mentioned in a police report and the amount of cash Mary carried in her purse. Carey testified that DCDJFS was initially notified by law enforcement of an allegation by Mary that her son Scott stole $900,000 from her home. However, when Carey actually obtained the police report, it stated that Mary and appellant together reported that Scott stole $98,000. There was no "error" by Carey, and instead she was testifying about the amount reported versus the amount contained in the police report. Appellant also states Carey "inflated" the amount of cash in Mary's purse "from $7,100 to $500,000." Carey stated there was approximately $7,100 in Mary's purse, but did not testify there was $500,000 in Mary's purse. Rather, Carey reported there was $500,000 in Mary's house. McCoy testified during the hearing that there was $7,162.76 in Mary's purse.

{¶83} Appellant's thirteenth assignment of error is overruled.

{¶84} Based on the foregoing, appellant's assignments of error are overruled.

{¶85} The May 16, 2022 judgment entry of the Delaware County Court of Common Pleas, Probate Division, is affirmed.